IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

CHRISTINE HUGHES ）
                                                      ）
v.                                                    ）        CASE NO. 1:06-CV-33
                                                      ）
JO ANNE B. BARNHART, Commissioner    ）        JUDGE CARTER
of the Social Security Administration        ）

## MEMORANDUM

This is an action for judicial review of the final decision of Defendant, Commissioner of

Social Security ("Commissioner"), denying Plaintiff's application for disability insurance

benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I) and 423.

For reasons that follow, the decision of the Commissioner shall be **AFFIRMED**.

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff, born in 1963, had an eighth-grade education and previously worked as a bus

driver, housekeeper, and laundry worker (Tr. 58, 80, 334-35).

### Procedural Background

Plaintiff Christine Hughes filed an application[1] for disability and disability insurance

benefits on June 9, 2003, alleging she became disabled on March 1, 1996, due to ruptured discs,

hypertension, migraine headaches, right elbow damage, fibromyalgia, and difficulty lifting,

bending and stooping (Tr. 18, 64-67, 74, 81-82).  Plaintiff's date of last insured is December 31,

2001 (Tr. 68).  Her application was denied initially (Tr. 27-29), and upon reconsideration (Tr. 30-

[1]Plaintiff previously filed an application for disability insurance benefits on June 19, 2002,
alleging she became disabled on March 15, 1999, due to back problems and fibromyalgia.  The
onset date was amended to November 22, 1996 (Tr. 58-62, 69).  Her application was denied
initially and upon reconsideration in June 2003 (Tr. 101-03).

31). Thereafter, Plaintiff filed a request for hearing (Tr. 39-40). In August 2004, Plaintiff was represented by counsel and testified at an administrative hearing before Administrative Law Judge ("ALJ") Ronald Feibus (Tr. 329-77). Plaintiff's husband also testified at the hearing (Tr. 359-71). In October 2003, Plaintiff also alleged depression (Tr. 41).

On January 10, 2005, the ALJ found that Plaintiff retained the residual functional capacity to perform a significant range of unskilled, light work involving frequent, but not repetitive, use of her right arm (Tr. 23-24). The ALJ considered Plaintiff's residual functional capacity and found she could perform her past relevant work as a housekeeper (Tr. 24). Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Tr. 6-8). *See* 20 C.F.R. § 404.981.

Relevant Medical Evidence Prior to Date of Last Insured

Plaintiff alleges disability as of March 1996. The record does not document any medical developments until August 1996, five months following the alleged onset of disability. In August 1996, Plaintiff sought emergency room treatment for pain in her right elbow (Tr. 132). A CT scan of Plaintiff's right elbow identified no definite abnormality (Tr. 131).

In October 1996, Dr. Stohler noted pain in the extensor surface of the forearm, no symptoms referrable to the cervical spine with a full range of motion and range of motion in her right elbow was essentially normal. Dr. Stohler diagnosed traumatic lateral epicondylitis, right elbow, and opined once again that range of motion in the elbow was normal. He did not feel like surgical procedure would be indicated in the future. Dr. Stohler did not think Plaintiff had a sufficient trial of anti-inflammatory medicine, and noted he was rather discouraged she would not return to her work in housekeeping with lifting and required repetitive movement of the

2

dominant right upper extremity (Tr. 138,139). In November 1996, Dr. Stohler diagnosed

intermittent extensor tendinitis of Plaintiff's right elbow and forearm (Tr. 136). He assessed a

permanent restriction for Plaintiff's right upper extremity of lifting no more than 10 pounds and

performing no repetitive flexion or extension of the right elbow (Tr. 125, 136, 141). He opined

that Plaintiff could not return to her "job in housekeeping at Life Care Center," however, he had

no objection to Plaintiff returning to a light duty job with the above restrictions (Tr. 136).

Plaintiff was treated by Dr. Kenny Atkins and saw him numerous times prior to

December 31, 2001, the date of last insured. Treatment records begin on February 13, 1997 (Tr.

234). Although the records are difficult to read, one can decipher a history of migraine

headaches, asthma, recurrent abdominal pain and anxiety (Tr. 235-237). Plaintiff kept a

headache log and on December 9, 1997, she reported her headaches seemed to have improved

(Tr. 239). On April 21, 1998, Plaintiff reported no headaches since March. She requested a refill

of her Xanax and complained of a painful tailbone with occasional pain radiating down both legs.

She reported a fall five years prior. Dr. Adkins again noted chronic anxiety (Tr. 240). On

August 28, 1998, Plaintiff again consulted Dr. Atkins regarding her back. She reported back pain

of three weeks duration with pain radiating down into her right leg, and to a lesser extent into her

left leg. Dr. Atkins diagnosed her with lumbar strain and refilled her Mepergan and prescribed

Flexeril. He also instructed her regarding the symptoms of nerve root impingement (Tr. 242). On

April 28, 1999 (Tr. 246), Dr. Atkins' impression was "muscle tension headaches and chronic

anxiety." On October 18, 1999, Plaintiff complained to Dr. Atkins about right-sided back pain

since a motor vehicle accident on August 31. On March 24, 2000, after riding on a 4-wheeler,

she reported back and leg pain (Tr. 248) which Dr. Atkins assessed as mechanical back pain. On

April 19, 2000, Plaintiff complained of back pain and said that it seemed to be worse when she was standing on her right foot, that pain would shoot up her leg into her back. She stated her pain was getting better until she picked up a 5-gallon container of cooking oil. Her Mepergan was not providing any relief and she was taking Darvocet. Dr. Atkins referred her to physical therapy and prescribed Vioxx (Tr. 249, 250). On May 4, 2000, Plaintiff needed a refill of her Vioxx and Darvocet (Tr. 251).

On May 16, 2000, an x-ray of Plaintiff's spine revealed no definite acute process (Tr. 226). On June 2, 2000, Plaintiff underwent an MRI of her lumbar spine, which showed a central extruded disc at L5-S1 (Tr. 165, 227). In July 2000, Dr. Atkins referred Plaintiff to neurosurgeon Dr. Boehm for back pain (Tr. 225), who reviewed her lumbar MRI (Tr. 214-15). Upon examination, Dr. Boehm found no motor deficits in any of the extremities (Tr. 215). He noted that Plaintiff had a good range of motion in her back with pain while attempting to extend to the neutral position after flexing to 90 degrees. *Id*. On August 7, 2000, Plaintiff received an epidural steroid injection to treat back pain (Tr. 197-98). Thereafter, Dr. Boehm reported that Plaintiff "had considerable relief of her back pain" (Tr. 212). On August 15, 2000, Plaintiff received a second steroid injection (Tr. 193-96).

On September 16, 2000, Plaintiff underwent another MRI of her lumbar spine, which again showed a central extruded disc at L5-S1 without displacement of neural structures (Tr. 192). Dr. Boehm concluded that Plaintiff's MRI results were unchanged from the previous scan (Tr. 218). He noted that he could not justify operating for her disc problem on the basis of her pain, and recommended a vigorous exercise program for her back. *Id*. On October 31, 2000, Dr. Boehm reported that Plaintiff was "much better from every standpoint...back is better" (Tr. 217).

He continued conservative management of her pain and found no indications for surgery. *Id*. Dr. Boehm found that although Plaintiff reported a tightening of her right back while standing, her back pain was "definitely better" (Tr. 216). Plaintiff had good range of motion in her back, was able to touch the ground with her hands, and had no significant mechanical back spasm (Tr. 216).

In February 2001, Dr. Boehm saw Plaintiff for a follow-up evaluation (Tr. 204-05). At a follow-up visit on February 13, 2001, Dr. Boehm notes "There is markedly diminished range of motion of the back because of pain and muscle spasm" (Tr. 204). On March 6, 2001, plaintiff continued to suffer from diminished range of motion of the back (Tr. 206). Again on September 25, 2001, she displayed a diminished range of motion of the back (Tr. 202). Dr. Boehm concluded that Plaintiff continued to have acute back pain with a known central disc rupture at L-5, which was improving (Tr. 202). In March 2001, Dr. Boehm saw Plaintiff and noted that she was much better from the standpoint of her back pain than when last seen three weeks ago (Tr. 206). Dr. Boehm planned to continue with conservative management. He noted that Plaintiff had asked whether she could work. *Id*. Dr. Boehm replied that Plaintiff was clearly capable of performing some type of work as long as it was commensurate with her pain level. *Id*.

In March 2001, Plaintiff questioned Dr. Atkins about whether she would qualify for disability; she had already quit work in 1996 due to tendinitis in her right arm (Tr. 289). Dr. Atkins advised her it would be difficult because back pain was difficult to assess by any objective tool. *Id*.

In September 2001, the results of Plaintiff's electromyogram and nerve stimulation studies were normal (Tr. 172-74). In June of 2000, Dr. Atkins reported the results of an MRI reflecting an extruded disc at L5-S1. The extrusion was central with no other disc extrusion or

protrusion identified.  The distal cord appeared normal (Tr. 165). On October 15, 2001, Plaintiff underwent an MRI of her lumbar spine.  Results showed a very small left paracentral disc protrusion at L5-S1 that did not contact the thecal sac of the S1 nerve root (Tr.  203).  Dr. Boehm interpreted the results and explained to Plaintiff that her MRI showed a very small disc rupture at the L5-S1 level that was producing no pressure on the surrounding structures of consequence.  *Id*. Dr. Boehm concluded that, therefore, its relationship to her pain pattern was not really clear (Tr. 200).  Consequently, he would not recommend any type of surgical intervention.  *Id*.  By October 2001, Plaintiff asked Dr. Atkins to start prescribing Darvocet for her because Dr. Boehm "did not want to see her again" (Tr. 290).

<u>Medical Evidence After Plaintiff's Date Last Insured for Disability Benefits</u>

In May 2002, over four months after her date last insured, Plaintiff was hospitalized with right upper quadrant pain (Tr. 220-24, 284).  She reported a history of asthma, fibroids, cesarean sections with an appendectomy, a dilatation and curettage, migraines, fibromyalgia, chronic anxiety and high blood pressure (Tr. 221A-222).  Plaintiff  was discharged with the diagnoses of an inflamed gallbladder without stones, fibromyalgia, chronic tension headaches, and hypertension (Tr. 220).

On January 28, 2004, Dr. Atkins referred Plaintiff to Dr. Kabakibou because "her attorney who represents her in her pursuit of disability benefits recommended" that she see him (Tr. 290). In February 2004, Plaintiff saw Dr. Atkins and reported that a pain specialist had performed a steroid nerve block which had "significantly helped her pain" (Tr. 287).  Plaintiff further stated that she had been doing housework lately.  *Id*.  Dr. Kabakibou noted in February 2004 that the block injection gave her almost 90% relief of pain and she was "quite happy with the result" (Tr.

310).  There was significant improvement in her pain level and ability to function.  *Id*.  Dr.

Kabakibou reported that Plaintiff's quality of life had significantly improved.  *Id*.  In the same

note, Dr. Kabakibou opined that Plaintiff was considered totally disabled and not able to do any

job secondary to her facet joint problem and fibromyalgia (Tr. 311).

In March 2004, Plaintiff reported to Dr. Kabakibou that the injection provided "good

help" and that she was 40% better (Tr. 308).  She did well in February and early March with

radiofrequency pain treatment (Tr. 305).  In April 2004, Plaintiff reported that she was not quite

as good, but did not feel that she needed more radiofrequency treatment.  *Id*.  Dr. Kabakibou

noted that Plaintiff recently had "a facet joint block which helped her tremendously" and from

which she was still benefitting (Tr. 306).

By May 2004, two and one-half years following her date last insured, Plaintiff saw Dr.

Atkins for an annual check-up and complained of migraines and indigestion (Tr. 286).  She

reported that "she was out riding her four-wheeler on Sunday" and had not reported any back

pain.  *Id*.  Plaintiff stated that she sometimes had tingling and pain in her right leg, but was doing

better since she had the steroid block.  *Id*.

On May 27, 2004, Plaintiff saw Dr. Kabakibou and reported that Dr. Atkins had treated

her for migraines for years (Tr. 304).  She complained of low back pain, myofascial pain and

depression.  *Id*.  In June 2004, Plaintiff saw Dr. Kabakibou and reported that she "had a little bit

more stress in her life and it is giving her kind of a headache" (Tr. 302).  Dr. Kabakibou

diagnosed low back pain, bulging disc, myofascial pain and depression with poor coping; he

renewed her medications.  *Id*.  On July 22, 2004, Dr. Kabakibou saw Plaintiff for a follow-up and

medication refill; he noted she was "doing well on this combination of medicine and denies any

side effects of the medications including on mental function." (Tr. 301).

In July 2004, Dr. Kabakibou completed a questionnaire from Plaintiff's counsel (Tr. 312-13). He opined that her overall level of pain was moderate, or a 3 out of 5, defined as tolerable but would cause marked handicap in the performance of the pain-causing activity (Tr. 313).

#### Medical Evidence Following Plaintiff's Administrative Hearing

Following her administrative hearing and at the ALJ's request, Plaintiff saw Dr. Kim for a consultative psychiatric examination on October 11, 2004 (Tr. 319). Plaintiff recited her physical complaints; she claimed that the epidural injections "didn't help her much." *Id*. Dr. Kim noted that she had never been seen by a psychiatrist. *Id*. Plaintiff described her activities of daily living to Dr. Kim; she got up around 6:30 am, took her granddaughter to school, returned home and watched television in her recliner (Tr. 320). She stated that she did some housework, but her husband did most of the heavy work. *Id*. If she had a bad headache, she would stay in bed. *Id*. Plaintiff and her husband went grocery shopping together; she attended church regularly. *Id*. Her hobbies were sewing and cooking; she independently took care of her personal care and grooming. *Id*. Upon examination, Plaintiff was irritable and had a labile affect; her speech was goal-directed and coherent (Tr. 320). She was alert in all spheres with no looseness of association and no overt psychotic distortion in thinking or perception. *Id*. Dr. Kim diagnosed depression not otherwise specified, chronic pain, and mild to moderate psychosocial stressors; he assessed a GAF score of 60[2] (Tr. 321). Plaintiff reported that her antidepressant medication had

___

[2]The Global Assessment of Functioning (GAF) Scale measures overall psychological function on a scale of 0-100. A GAF score of 51-60 indicates some moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders (Text Revision)* 34 (4th ed. 2000).

helped her somewhat. *Id*. Dr. Kim opined that her prognosis of going back to her prior productive life was poor, but she was capable of handling her own funds. *Id*.

In assessing Plaintiff's mental ability to perform work-related activities in October 2004, Dr. Kim concluded that Plaintiff was only slightly limited in her abilities to understand, remember, and carry out detailed instructions (Tr. 322). He found Plaintiff had no limitations in her abilities to understand, remember, and carry out short, simple instructions. *Id*. Also, Dr. Kim found that she had no limitations in the ability to make judgments on simple, work-related decisions. *Id*. Dr. Kim concluded that Plaintiff was moderately impaired in her ability to respond appropriately to work pressures in a usual work setting (Tr. 323). He found she was only slightly impaired in her ability to respond appropriately to work pressures in a routine work setting, and only slightly impaired in her ability to interact with co-workers, supervisors and the public. *Id*. There were no other capabilities affected by Plaintiff's impairment. *Id*.

Evidence Submitted to the Appeals Council

Plaintiff submitted additional documentation to the Appeals Council with her request for review of the ALJ's decision, consisting of a letter from her attorney dated May 16, 2005 (Tr. 325-27), as well as a letter from Dr. Kabakibou (Tr. 328). In March 2005, Dr. Kabakibou wrote to the ALJ and addressed his decision in this case. He notes plaintiff's pain returned in September 2004 and she did undergo radiofrequency treatment which was beneficial as well and reduced her pain (Tr. 328).

Exhibit Attached to Plaintiff's Brief

Plaintiff has submitted her Brief in support of her Motion for Reversal or Remand (Document 15). As exhibit A, she attaches three job descriptions. The information from

http://www.occupationalinfo.org describes a hospital cleaner, housekeeping cleaner, and laundry worker.

Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit")

has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

<u>How Disability Benefits Are Determined</u>

The Sixth Circuit recently reiterated the five-step procedure used by the Social Security Administration ("SSA") to determine eligibility for disability benefits as follows:

> The [Social Security] Act entitles to benefits payments certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). Such claimants qualify as "disabled." *Id.* A claimant qualifies as disabled if she cannot, in light of her age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). To identify claimants who satisfy this definition of disability, the SSA uses a five-step "sequential evaluation process." 20 C.F.R § 404.1520(a)(4). The five steps are as follows:
>
> In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. *Id.* § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.
>
> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory

definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.*; § 404.1560(c)(1). The SSA bears the burden of proof at step five. *See Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir. 2003).

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

<u>ALJ's Findings</u>

The ALJ made the following findings in support of the Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1.  The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability (20 CFR § 404.1520(b)).

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her subjective limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the residual functional capacity described above in the decision (20 CFR § 404.1567).

8. The claimant is able to perform her vocationally relevant past work as a housekeeper (20 CFR § 404.1565).

9. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. 24).

## Issues Presented by Plaintiff

Plaintiff argues substantial evidence does not support the Commissioner's decision because the ALJ improperly evaluated plaintiff's subjective complaints of pain and failed to properly evaluate plaintiff's residual functional capacity. The parties are in agreement, and the record reflects Plaintiff's date of last insured was December 31, 2001. Therefore, the relevant period during which Plaintiff must be found disabled is from March 1, 1996, the date she alleges disability until December 31, 2001, the date of last insured. However, evidence subsequent to the date when insured status expired can be considered to the extent that it may be relevant to the earlier medical condition. *Halvorsen v. Heckler,* 743 F. 2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period.")

## The ALJ's Evaluation of Plaintiff's Subjective Complaints of Pain

A claimant's self-reported claims of disabling pain are not, standing alone, sufficient to

establish disability. *See* 20 C.F.R. §§ 404.1529(a) and 416.929(a). First, such claims must be supported by objective medical evidence (*i.e.*, medical signs and/or laboratory findings) of an underlying medical condition and, second, either (1) the objective medical evidence must confirm the severity of the alleged pain, or (2) the objectively established medical condition must be of such a severity that it can be reasonably expected to produce the alleged pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); 20 C.F.R. §§ 404.1529(a) and 416.929(a). Finally, the intensity and persistence of the claimant's symptoms must be evaluated to determine whether those symptoms limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1). Relevant evidence includes the claimant's medical history, statements by treating physicians, medications taken, medical treatment other than medication received to relieve pain or other symptoms, methods the claimant has used to relieve pain, precipitating and aggravating factors, daily activities, and statements by the claimant. 20 C.F.R. §§ 404.1529(c) and 416.929(c). Ultimately, it is the functional limitations imposed by a condition rather than the diagnosis itself which determines whether an individual is disabled. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

Pain caused by an impairment can be disabling, but each individual has a different tolerance of pain. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984). Thus, a determination of disability based on pain depends in part on the credibility of the claimant. *Id.*; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). In determining credibility, the ALJ considers, among other things, whether there are any inconsistencies between the claimant's statements and the rest of the evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of

observing the demeanor and credibility of the witness, his conclusions should be highly regarded. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

Plaintiff argues that a growing number of courts have recognized that fibromyalgia is a disabling impairment and that there are no objective tests that can conclusively confirm the disease. In this case, fibromyalgia is mentioned in the treatment notes of Dr. Atkins but I see no indication of the severity of this condition reaching disabling proportions until the opinion of Dr. Kabakibou in February of 2004, more than two years after Plaintiff's date of last insured. Further, the ALJ found and the record reflects that the opinion is unsupported by Dr. Kabakibou's own records and is inconsistent with other evidence of record.

Plaintiff argues that the ALJ erred in evaluating her limitations because he did not fully credit her testimony concerning the severity of her pain and Plaintiff argues "the ALJ did not specify or articulate his reasons for disregarding Plaintiff's testimony." Pl. Br. at 16. The opinion of the ALJ addresses this issue as follows:

> I find the record, taken as a whole, supports a limitation of the claimant's residual functional capacity to light physical work activity, as defined in Social Security Ruling 83-10, with an additional physical limitation of avoiding constant, repetitive use of the right arm. The claimant also has a non-exertional limitation to unskilled work, primarily as a result of moderate depression.
>
> I find the record does not document the severity of the subjective allegations about which the claimant testified at the hearing. The claimant's activities, as she reported at the hearing and to the consulting psychological examiner, are clearly inconsistent with disabling symptoms. (Exhibit 12F). Dr. Atkins also noted, in May 2004, she enjoys riding a four-wheeler, which is also inconsistent with the severe symptoms and limitations she has reported. (Exhibit 10F).
>
> The record shows the claimant has experienced good pain relief from conservative treatment. She told her pain specialist, in February 2004, she was "for the first

time enjoying her life and has improved the quality of her life significantly." Further, as late as April 2004, she declined his recommendation for a radiofrequency thermocoagulation procedure which was expected to offer even more prolonged pain relief. (Exhibit 11F). The claimant denied experiencing side effects of medication, and her mental functioning is, according to the record, only moderately limited by her depression. Significant mental status abnormalities have not been reported by examining physicians, the claimant has not sought mental health treatment, and the consultative examiner opined no more than moderate psychological limitation. (Exhibits 10E, 11F, and 12F). Thus, I find the claimant's allegations of disabling pain and impairment are not fully credible.

Due to the absence of significant objective and laboratory medical findings which provide confirmation of impairments which could reasonably be expected to cause the subjective complaints, and based on the relatively mild to moderate pathology documented by the clinical examinations, and considering the claimant's reported activities of daily living, all of which provide to me an indication as to the intensity, persistence and limitations caused by the subjective complaints, I find the claimant's subjective allegations to be unsupported by the record as a whole, i.e., the claimant's impairments do not satisfy both parts of the "two prong" symptoms analysis mandated by <u>Social Security Ruling 96-7p.</u>

Tr. 22

The ALJ also addressed the opinion of Dr. Kabakibou, the treating pain specialist who

opined in February 2004, two years after last date of insured, that Plaintiff was totally disabled.

In discounting his opinion the ALJ states:

I have considered the treating pain specialist's opinion. Dr. Kabakibou opined, in February 2004, the claimant was "totally disabled and not able to do any job secondary to the facet joint problem and fibromyalgia." He also averred the claimant experiences moderate pain, which is tolerable, but causes a marked handicap in the performance of the pain-causing activity. (Exhibit 11F). Statements such as "totally disabled," "unable to work," and the like represent an ultimate conclusion as to disability which is an issue reserved to the Commissioner (<u>Social Security Ruling 96-5p</u>). Further, Dr. Kabakibou's opinion is not supported by the overall record, and it is inconsistent with his own treatment notes, which show the claimant experienced good pain relief from conservative medical treatment. (Exhibit 11F).

Tr. 23

The Commissioner argues the ALJ detailed his evaluation of Plaintiff's pain as provided by 20 C.F.R. § 404.1529 and Social Security Ruling (SSR) 96-7p (Tr. 19-25). He noted his "careful consideration" of Plaintiff's subjective complaints, including pain, and applied all the requisite factors, citing to the requirement's aforementioned regulations. *Id*. The ALJ found that the record did not document the severity of the subjective allegations about which the claimant testified at the hearing. . . [her] activities, as she reported at the hearing and to the consulting psychological examiner, were inconsistent with disabling symptoms (Tr. 22). As the ALJ cited, in May 2004, although alleging she was totally disabled for years by back and elbow pain, Plaintiff told Dr. Atkins that she had been "out riding her four-wheeler on Sunday" (Tr. 286). Plaintiff reported no resultant back pain, and had injured her back in the past while riding her four-wheeler. *Id*. The ALJ properly assessed the credibility of her reportedly disabling symptoms accordingly. The ALJ noted that the record showed Plaintiff had good pain relief from conservative treatment. In fact, she told Dr. Kabakibou that she was enjoying her life for the first time in February 2004 (Tr. 310-11). He reasonably concluded that Plaintiff failed to establish that her symptoms were as intense or as limiting as she alleged. Her neurosurgeon, Dr. Boehm, found there was no clear relationship between Plaintiff's very small disc protrusion and her pain pattern (Tr. 200). As the ALJ noted, Dr. Kabakibou noted that Plaintiff was "doing well on this combination of medicine and denies any side effects of the medications including on mental function" (Tr. 22, 301).

SSR 96-7p specifies that the ALJ must consider all of the evidence in the case record, including, but not limited to, the individual's daily activities in assessing the credibility of her statements. The record evidence reveals Plaintiff led a relatively normal life, considering that she

was unemployed, experiencing psychosocial family stressors, and was suffering some physical setbacks. Plaintiff was sufficiently active to allow her to ride a four-wheeler, play with her dogs, visit her mother-in-law regularly, drive her granddaughter to school, engage in crafting hobbies, and do some housework, notwithstanding her complaints of disabling limitations. These factors could reasonably be considered by the ALJ.

Other credibility factors tended to undermine Plaintiff's allegations of total disability. As discussed above, her physical limitations were minor, she was somewhat active, and has not shown she was further limited from the light work found by the ALJ. While there were medical opinions noting significant problems, there was substantial evidence supporting the conclusion that Plaintiff could perform a full range of light work. For example, in October 2000, Dr. Boehm reported that Plaintiff was "much better from every standpoint...back is better" (Tr. 217). He continued conservative management of her pain and found no indications for surgery. *Id*. Plaintiff had good range of motion in her back, was able to touch the ground with her hands, and had no significant mechanical back spasm (Tr. 216). In March 2001, Dr. Boehm planned to continue with conservative management. He noted that Plaintiff had asked whether she could work (Tr. 206). Dr. Boehm replied that Plaintiff was clearly capable of performing some type of work as long as it was commensurate with her pain level. *Id*. In addition, the ALJ had the opinion of a state agency expert review consultant, Dr. Denise Bell. In October of 2002, eight months after the date of last insured, Dr. Bell offered her expert opinion after a review of the medical record which included a history of the injury to the right elbow, ruptured discs, fibromyalgia and migraines, that Plaintiff was capable of medium work with a lifting restriction of 50 pounds occasionally and 25 pounds frequently. Although the ALJ did not accord these

findings considerable weight because they were made without benefit of the Plaintiff's oral testimony, it was a finding entitled to some weight and it was discussed in the ALJ's opinion.

This Court generally accords great deference to the credibility findings made by the ALJ. *Casey v. Sec'y of Health & Human Servs.*, 987 F. 2d 1230, 1234 (6th Cir. 1993) (ALJ is charged with observing the demeanor and credibility of witnesses and, as such, his conclusions are entitled to great deference.) A plaintiff's credibility may be properly discounted where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.* 375 F.3d 387, 392 (6th Cir. 2004). Having cited a number of inconsistencies between the record and Plaintiff's allegations, I conclude there is substantial evidence in the record to support the conclusion of the ALJ regarding his evaluation of Plaintiff's subjective complaints of pain.

<u>The ALJ's Evaluation of Plaintiff's Residual Functional Capacity</u>

As the Commissioner notes, in this case the ALJ found that Plaintiff, a 41 year-old woman with low back and elbow pain, could perform unskilled light work, based on a medical record which revealed mostly unremarkable medical findings. There is no physician's opinion rendered during the relevant period[3] which would support Plaintiff's claim of disabling limitations except for the opinion of Dr. Stohler who, on December 3, 1996, assigned her a permanent physical impairment of 3% of the right upper extremity for her chronic intermittent extensor tendonitis of the right forearm and elbow. He restricted her lifting to 10 pounds with no repetitive flexion or extension of the right elbow (Tr 135). The ALJ's residual functional

_____

[3]Plaintiff saw Dr. Kabakibou (who opines she is disabled) for the first time in January 2004, over two years after the relevant period ended. Her date last insured was December 31, 2001 (Tr. 67).

capacity finding is consistent with the opinions of Drs. Atkins and Boehm, who treated Plaintiff, and the opinion of Dr. Bell, the non-examining state agency physician who opined, after a review of the record and without ever seeing Plaintiff, that Plaintiff was capable of medium work (50 pounds occasionally and 25 pounds frequently). The ALJ did reject Dr. Kabakibou's opinion of disability, rendered in February 2004. In evaluating the evidence, the ALJ properly weighed the record physicians' opinions and found Dr. Kabakibou's opinion that Plaintiff was "totally disabled" was unsupported by the record and inconsistent with his own findings (Tr. 23). As the ALJ notes, the opinion that an individual is disabled is not entitled to any significant weight because that issue is expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1). Contrary to Plaintiff's assertion, the ALJ reasonably declined to give Dr. Kabakibou's assessment controlling weight because it was unsupported by the objective medical findings and was inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Dr. Kabakibou's opinion was not adequately supported by treatment records or his findings. And, his opinion was inconsistent with Plaintiff's activities. His contemporaneous treatment notes reflect that the block injection gave her almost 90% relief of pain and she was "quite happy with the result" (Tr. 310). Dr. Kabakibou noted that there was significant improvement in her pain level and ability to function, on the same day that he opined she was totally disabled. *Id*. He prescribed a combination of medications and reported that Plaintiff's quality of life had significantly improved. *Id*. In contrast, Dr. Kabakibou opined in the same note that Plaintiff was considered totally disabled and not able to do any job secondary to her facet joint problem and fibromyalgia (Tr. 311). In July 2004, two and one half years after Plaintiff's date of last insured, Dr. Kabakibou completed a questionnaire from Plaintiff's counsel (Tr. 312-13). He opined that

her overall level of pain was moderate, or a 3 out of 5, defined as tolerable but would cause marked handicap in the performance of the pain-causing activity (Tr. 313). His opinion that her pain level was moderate does not support a conclusion that her pain was of disabling severity. Moreover, his opinion of disability is unsupported by any objective findings. Plaintiff submitted Dr. Kabakibou's letter of March 2005 to the Appeals Council, responding to the ALJ's decision; in his letter, Dr. Kabakibou gave no clinical findings to support markedly limited functioning (Tr. 328). Instead, Dr. Kabakibou attempted to clarify what improvement of pain meant to him, and noted that Plaintiff's pain was reduced by her radiofrequency treatment of September 2004. *Id*.

Diagnostic evidence did not support Dr. Kabakibou's opinion of Plaintiff's disabling pain. The laboratory results were largely normal for both her back and elbow impairments. A May 2000 x-ray of her spine was normal (Tr. 226). Repeated MRI scans of her lumbar spine showed the same central extruded disc at L5-S1, without degeneration (Tr. 165, 192, 203, 218, 227). In September 2001, the results of Plaintiff's electromyogram and nerve stimulation studies were normal (Tr. 172-74). Also, in November 1995, an x-ray of Plaintiff's right elbow was normal, showing a very small joint effusion, without evidence of fracture or tear (Tr. 133). In December 1995, an MRI of Plaintiff's right elbow showed a very small joint effusion; there was no evidence of a fracture, tendon or muscular tear (Tr. 170). In August 1996, a CT scan of Plaintiff's right elbow was normal (Tr. 131).

Furthermore, other record medical evidence is inconsistent with Dr. Kabakibou's extreme opinion that Plaintiff was totally and permanently disabled, and unable to work. Drs. Stohler, Atkins and Boehm all found Plaintiff was more capable and could work. For example, in March 2001, Dr. Boehm noted that her back pain was "much better" (Tr. 206). Again, he diagnosed a

central ruptured disc at L-5 with acute flare up of pain, so he planned to continue with conservative management. *Id.* Dr. Boehm found that Plaintiff was clearly capable of performing some type of work as long as it was commensurate with her pain level. *Id.* Of course it is possible that Plaintiff's limitations were greater at the time of Dr. Kabakibou's examination which was two years after Plaintiff's date of last insured.

Similarly, although Dr. Stohler opined in 1996 that Plaintiff could not return to her "job in housekeeping at Life Care Center," he had no objection to Plaintiff returning to a light duty job (Tr. 136). And, in March 2001, when Plaintiff questioned Dr. Atkins about whether she would qualify for disability, he declined to speculate (Tr. 289). Dr. Atkins responded that it would be difficult because back pain was difficult to assess by any objective tool. *Id.*

Finally, Dr. Kabakibou's opinion was also inconsistent with other record evidence, including Plaintiff's activities of daily living, such as housework and self-care. Plaintiff's activities are further evidence of inconsistencies with Dr. Kabakibou's conclusory opinion. For example, in February 2004, Plaintiff told Dr. Atkins that she had been doing housework (Tr. 287). By May 2004, Plaintiff reported that "she was out riding her four-wheeler on Sunday" (Tr. 286). In October 2004, Plaintiff described her typical activities: she got up around 6:30 am, took her granddaughter to school, returned home and watched television in her recliner (Tr. 320). Plaintiff and her husband went grocery shopping together; she attended church regularly. *Id.* Her hobbies were sewing and cooking; she independently took care of her personal care and grooming (Tr. 320, 358). Plaintiff testified that she visited her mother-in-law, played with her dogs, fed fish in her pond, washed dishes, made the bed and cooked (Tr. 336-41). Plaintiff's reported ability to carry out various daily activities shows her impairments were not disabling.

For those reasons, I conclude Dr. Kabakibou's statement that Plaintiff was disabled and unable to work does not prove that her impairments were disabling prior to her date of last insured. As identified by the ALJ, decisions about a claimant's disability are reserved for the Commissioner in conjunction with medical evidence and agency rules and regulations. *See* 20 C.F.R. § 404.1527(e).

The ALJ considered the above evidence and did not find it sufficient to establish that her impairments resulted in any additional functional limitations not already accommodated by his residual functional capacity finding.

The question still remains as to whether there is substantial evidence in the record to support the conclusion of the ALJ that plaintiff was able to return to her past job as housekeeper. The burden is on the Plaintiff to establish a prima facie case of disability by proving that she is unable to perform her past work. *Mitchell v. Bowen*, 827 F.2d 387, 389 (8th Cir. 1987); *Villa v. Heckler*, 797 F.2d 794, 797 (9th Cir. 1986). To determine whether a plaintiff can do her past work, an ALJ ascertains the demands of the former work, and compares these to plaintiff's present abilities. 20 C.F.R. § 404.1520(e); *Villa*, 797 F.2d at 798. In this case, the ALJ did determine the demands of Plaintiff's past work by the use of testimony from Plaintiff and the record evidence including her description of her job as she performed it.

Plaintiff asserts that the ALJ erred in finding that she could return to her past work as a housekeeper. The ALJ described Plaintiff's past work as light level work, and Plaintiff asserts that this classification was incorrect. Plaintiff argues that her past work was medium level work, and that the medical evidence clearly establishes that she cannot do medium level work. According to Agency regulations, light work entails "lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). In addition, this category of work may require a good deal of walking or standing, or involve sitting most of the time with pushing and pulling of arm or leg controls. *Id*. Medium work, in contrast, entails "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Here, Plaintiff described her job as a housekeeper as cleaning rooms and doing laundry (Tr. 87). She wrote that she "carried heavy laundry and mop buckets" and "pulled clothes in and out of washers and dryers" and also "bended a lot in housekeeping." *Id*. Plaintiff reported that the heaviest weight she lifted was 20 pounds, and the weight that she frequently lifted was 10 pounds. *Id*. These limitations are consistent with the definition of light work. It is important to recognize that Plaintiff's own description of her past work categorizes it as light work. Plaintiff recorded that she did not use machines, tools or equipment; did not use technical skills or knowledge; and did not write reports or complete forms (Tr. 87). As the ALJ noted, the *DOT*[4] describes these jobs as light exertion, unskilled, and requiring frequent, but not repetitive, reaching and handling and only occasional fingering (Tr. 23-24).

Plaintiff asserts that the *DOT* describes the positions of hospital cleaner and laundry worker as medium level work, and the ALJ should have found that Plaintiff's past work was medium level. Pl. Br. at 22. However, the *DOT* delineates general job categories, and does not dictate a mandatory category of exertion for each job listed. The ALJ can make a determination that a Plaintiff's prior work duties do not fall within those envisioned by the listed category. *Carter v. Sec'y of Health & Human Servs.*, 834 F.2d 97 (6th Cir.1987).

---

[4]*Dictionary of Occupational Titles,* U.S. Department of Labor, (4th ed. 1991)(*DOT*).

On the one hand, Plaintiff attempts to rely on the *DOT* to prove she could not perform her past relevant work. Pl. Br. at 22. On the other, Plaintiff implies that the ALJ could not have relied on the *DOT* and needed a vocational expert. Plaintiff argues that the ALJ should have called a vocational expert to testify at the hearing in order to specifically categorize Plaintiff's work. Pl. Br. at 23. However, the regulations do not require a vocational expert's testimony in a step-four case. *See* 20 C.F.R. § 404.1566(e). All the ALJ was required to do was determine the requirements of Plaintiff's past work and decide whether she met those requirements based on the credible medical evidence. He properly considered Plaintiff's testimony and the work history report she provided, as well as the *DOT* in conformance with the regulations. 20 C.F.R. § 404.1560(B)(2) ("We may use the services of . . . the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."). The ALJ also properly considered the descriptions in the record of Plaintiff's level of activity as she actually performed the job.

Arguably the December 3, 1996, permanent restriction assessed by Dr. Stohler could limit Plaintiff to sedentary work and if it did, I would have to remand this case for a determination under step 5 as to whether there were other jobs in the economy Plaintiff could perform. In a step 5 determination, the burden would shift to the Commissioner and a VE would have to be called to assist in the determination of whether there are jobs plaintiff can perform. In this case however, there is evidence upon which the ALJ could reasonably rely to support his conclusion. Although he did not give great weight to the opinion, the state agency physician, Dr. Bell, reviewed the medical record a short time after plaintiff's last date of insured and based on that

review opined Plaintiff was capable of work at the medium level, 50 pounds occasionally and 25 pounds frequently (Tr. 277, 278). The ALJ gave Plaintiff the benefit of the doubt and assessed her as capable of only light work in spite of the opinion of Dr. Bell. Other medical evidence in the record during the relevant period included was considered. In March 2001, Dr. Boehm saw Plaintiff and noted that she was much better from the standpoint of her back pain when last seen three weeks ago (Tr. 206). Dr. Boehm planned to continue with conservative management. He noted that Plaintiff had asked whether she could work. *Id*. Dr. Boehm replied that Plaintiff was clearly capable of performing some type of work as long as it was commensurate with her pain level. *Id*.

I conclude that the ALJ's opinion in finding Plaintiff capable of performing light work to be supported by substantial evidence.

Plaintiff argues that there is no function-by-function analysis in the ALJ's decision. Pl. Br. at 21. In fact, the ALJ specifically noted that in addition to a limitation to light work, he provided "an additional physical limitation of avoiding constant, repetitive use of the right arm. That is the limitation assigned by Dr. Stohler. The claimant also has a non-exceptional limitation to unskilled work, primarily as a result of moderate depression" (Tr. 22). This analysis comports with the regulations. While a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing. *Delgado v. Comm'r of Soc. Sec.*, No. 00-4200, 2002 WL 343402, at **5 (6th Cir. Mar. 4, 2002) (quoting *Bencivengo v. Comm'r of Soc. Sec.*, No. 00-1995 (3d Cir. Dec. 19, 2000)). Further, in this case the ALJ is referring to the past work as Plaintiff herself described it in her work history report (Tr. 87).

Plaintiff complains that the ALJ did not discuss her husband's testimony and that this was

reversible error.  Pl. Br. at 21.  There is case law to the contrary which is cited by the Commissioner.  *See Wheeler v. Apfel*, 224 F.3d 891, 896 (8th Cir. 2000) ("Although the ALJ did not list specific reasons for discrediting the testimony of Wheeler's husband, the omission is not fatal to the ALJ's decision because the same evidence supported discounting both Wheeler's and her husband's testimony.").  *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 842 (6th Cir. 2005) ("Given the ALJ's lengthy discussion of the lack of objective evidence supporting these claimed physical limitations, we find that the ALJ's failure to mention specifically the mother's letter is not reversible error.").

Conclusion

I have carefully reviewed the administrative record and briefs filed in support of the position of the respective parties. Based on that review, I conclude there is substantial evidence in the administrative record which supports the decision of the Commissioner denying Plaintiff's application for benefits.  Accordingly, the decision of the Commissioner denying Plaintiff's application for benefits is **AFFIRMED**.  A judgment shall enter in accordance with this order.

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE